I have been racking my brain trying to think of a more elegant way to phrase the legal issue as I see it that's currently before the Court and hopefully I will make my best effort here this morning. First, I don't think there is any dispute between the parties that the first agreement of 2001 was in fact superseded and substituted by the 2003 agreement and that that substitution of the two contracts constituted an ovation under the law. I also don't believe there is any dispute between the parties that the effect of an ovation on the first contract is to discharge the rights and obligations that the parties had under the prior contract to the extent that they are not subsumed into the second contract. One way to look at this particular issue that's before the Court is the issue of the first four titles that the District Court in its order found were generated pursuant to the to approve those products. One of the obligations that were in that particular contract on the part of my client was to seek that approval. So, we have both a right and an obligation that arose under the first agreement that if the concept of ovation is correct as applied to this case, both that right and that obligation were discharged upon execution of the second requirement of further approval of the first four titles that were admittedly generated pursuant to the first agreement still outstanding when we get to the second agreement. If you look at the second agreement, it has a very specific section, 4.3, and an attached schedule C that gives a timetable for such things as development of the licensed product and for approval by school zone. The first four titles are not on schedule C, and the Court found that that's because they'd already been done pursuant to the first agreement and therefore didn't need to be part of the second agreement. Yet, it is school zone's position that they still needed approval of the first four titles, and our position is then necessarily the first four titles should have been identified on the schedule, admittedly with the majority of the work already completed, but under the last portion, approval of the packaging, there should have been a time period for approval of the packaging of the first four titles. If, in fact, approval of the packaging for the first four title was still required under the terms of the agreement, we say that as of the date the second agreement is signed, our client had already thought that they had approval. District Court disagreed that there was formal approval given, but they'd already shipped some of the product in question. If school zone's position is correct, as of the date our client signs the second contract, they're already automatically in breach of it because they've already done something that violates it. The only reasonable interpretation of the two contracts together is the parties intended the second contract to supersede the first, and that as to new products that still needed to be developed, the parties would follow the schedule and that the first four titles were now deemed completed. That was our client's I believe that's the legal issue that is before this Court, is what, in fact, was the nature and effect of the parties' novation of the first contract with the second, and what is the correct interpretation of the two contracts, when read together, as to what obligations would have still survived and which ones would have been discharged as a result of the novation. Well, the word novation is not used in the second contract at all, is it? The second contract specifically provides in it that it is intended to supersede the first. Yes, but the word novation does not use it. No, the word novation does not, but a novation is defined as a subsequent agreement that was intended to supersede the first, and the parties recite that in the second agreement. As a matter of fact, in the first amended complaint filed by the plaintiff, they allege that the second agreement was intended to supersede the first. And, indeed, what Doesn't the second agreement, though, contain the same general requirement that the first agreement had of approval by school zone of anything that is being produced under this contract? It does, Your Honor, in paragraph 6.1, require approval of the licensed product. But then again, paragraph 4.3 says approval of the various stages of the licensed product is governed by Schedule C. And when you go to Schedule C, there's no requirement for further approval of any of the first four titles. So if the term licensed product, as used in 6.1, is the same as in 4.3, that means the approval process is no longer further required because the parties drafted a specific provision in the contract that dealt with the timing and the need for further approval, and it's not there. So the trial court found in its final ruling that the parties didn't intend the first four titles to be part of that schedule because it wasn't the licensed product. Yet with the term licensed product, it's the same language that appears in 6.1 that they rely upon to say, you still needed approval. So it's contradictory no matter which way you go. Well, it has to be a licensed product for you to distribute it. Correct. And it is listed in the, they're listed in one paragraph of the 2003 agreement, aren't they, the first four titles? The first four titles are part of the licensed product. The first four titles are not part of Schedule C, which, if you go back to paragraph 4.3 of the parties' agreement, says this is the schedule for the approval of the licensed product. Our position is, is that's consistent with the exchange of letters between the lawyers where Starry Media's lawyer said we assume the first four are deemed approved once we sign a new agreement, and the letter back was everything's open until we sign a comprehensive agreement. Well, a comprehensive agreement got written between the parties, and that comprehensive agreement had a specific section on timetable for further approval of the licensed product, with no requirement for further submission of the packaging with respect to the first four titles. Because everybody knew they'd already produced a bunch of the stuff, and they'd already shipped it out. I mean, we would be admitting to a breach as soon as we signed it, if it applied to the first four titles. Now, our clients agreed that on the next run, yeah, we'll change the language on the CD-ROM package, because it was really of a de minimis dispute. It was, instead of saying copyright school zone, it said copyright Starry Media. They wanted it changed. Well, yeah, but I can, that may not be de minimis. I mean, it's their licensing distribution, and they want their copyright to show up. And I don't disagree with that. But the problem is, is that under the first agreement, it says it's supposed to protect the publisher's rights, too. The publisher, in this case, was Starry Media. Starry Media was protecting both of them by putting a copyright notice on it. I don't think it was anybody would possibly be confused that it was a school zone product, because a school zone product was the thing that had the trade name, and was such a good product, that's why they thought it would be selling in Arabic and Spanish and other languages. I don't know if your honors are familiar with the concept of localization. What they would do is use the same language, but of course, change it to, I mean, not the same language, the same terminology, but then change the language. And it would also change the background setting in the CD-ROM, so that it would be more fit for the culture that you're attempting to sell it in. So that's really all that was being accomplished, was rewrite it, put new backgrounds, so that it would be more marketable. The school zone had a great product. Our client wanted to trade on that, and that was the reason why they entered into the contract in the first place. I don't know if I answered your question. I hope I did. Why don't you reserve the rest of your time for rebuttal, and we'll hear from you inside. I will. Thank you. Good morning, your honors. Ronald St. Marie on behalf of the Apo Lee School Zone Multimedia Zone, DBA, School Zone Interactive. This case involves an infringement of copyrights and trademarks where the defense was, no, no, we have a license. And it was their obligation to prove that they had permission to copy our trademarks and copyrights. They pointed to the license agreement. The license agreement required that we approve any product that they sell. During the course of discovery in the case, we said, tell us where we approved these specific four titles. And they came up with three e-mails that had nothing to do with approval. One of the e-mails said, your work on this is outstanding. And they said that that meant that the work is excellent. In fact, it meant, if you read the e-mail, that you haven't done it yet. So there's no evidence that we actually approved it. We come to the summary judgment hearing, and they come up with this argument of novation. They say, no, no, no, although you didn't actually approve it, you should be assumed to have approved it because you entered into this second agreement. And based on the issue of novation. And I say novation with release. Novation means a substitution of obligations. It doesn't mean release of any prior breaches. An example, if there is an employment agreement that prohibits embezzlement, and during the course of that employment agreement there is embezzlement, and then the parties enter into a new employment agreement saying we're going to change the terms somewhat, and then the embezzlement is discovered during the course of that second agreement, the employee would be hard pressed to say, no, no, you can't discharge me under the second agreement because I embezzled under the first, and we have a new agreement. In this case, the obligation to seek approval continues from the first agreement to the second agreement. We didn't discharge any prior breaches or any prior sales of unapproved products. Well, what does the language mean when it says this agreement cancels and supersedes the prior contract? I think it means cancels. It says that this is going to be the agreement that will govern our relationship going backwards and going forwards. Well, what does the word cancels mean there? I believe the ---- Supersede, you can understand your argument. Cancels is a bit stronger. Doesn't that imply release? I don't believe it implies release. No, because there's no specific statement. First of all, we didn't even know that they had made these sales of these unapproved products until after we entered into the second agreement. In fact, what happened was we signed the second agreement in January. They delayed signing it until March, and during that period, they were selling this product, unapproved product, out the back door without our approval. We only discovered this months later. I believe the term cancellation should be read with the intent of the parties. The parties did not intend a release. Certainly, as lawyers, we all know how to draft release clauses, and there's specific language that you use, and there's specific code sections that you suggest should be used to say we're going to release everything. Even if you don't know there's a problem, we're going to release it. To take from the term cancellation in the context of this negotiation and say that means release, I think is reading into this agreement. The second agreement is something that just isn't there. What about the terms of the second agreement itself? The arguments made that, look, you've got licensed product described, and it includes the first four, and then you've got an approval section that doesn't include the first four, so the assumption you should draw from that is that the first four are considered approved. Well, the problem with that is that Schedule C really addresses products going forward, and it addresses those products that we haven't given them the background information. We haven't given them the programs, so we're going to set up a schedule so they have to perform. The last thing is you provide us with the final version, and we'll approve or disapprove. If we disapprove, you've got to come back and fix it. Well, we've already done that. We already reached that stage with these first four products. They had already submitted them to us. We told them there's problems with the packaging. You need to fix it. There's just no reason to include that in Schedule C. All we were waiting for them to do is come up with the new packaging with the correct copyright designation. Well, what would have happened then? If they did it, then we would say you can sell that. But what happened was they had sold the stuff with the wrong copyright designation before we entered into the second agreement. You know, I mean, it seems to me that you either had to, I mean, I think there's a good argument to be made that those products should have been identified on Exhibit C or some special provision ought to have been made for those products because that was an outstanding, in your use of the word, obligation or dealing between the party and the prior contract. But you cancel a contract, you supersede it, and you list the licensed products that need approval in C. Again, your argument goes back to what was the intent of the parties. Should, would it have been better, would we even be here if they had, we had just made it clear that we haven't yet approved these products? Doubtlessly, it would have been better if the draftsman had included it. But if you look at the negotiations, they said we want specifically, we want you to say this was approved in the second agreement. That's what they said in one of the letters that they attached or they relied on. And we said, no, we'll deal with that in the agreement. Well, the agreement didn't deal with that. There's no dispute that nothing in the agreement says we have approved these four titles. What they're saying is, although we can't come up with any communication where you said we approved it, although we can't come up with any document that says we approved it, we want you to assume that it was approved because it just wasn't mentioned in the second agreement. That, I believe, reads too much into the, quote, unquote, silence of the agreement. I don't think you can conclude because we didn't address that in the second agreement we had approved it. I mean, every communication we had with them that's been submitted to the Court said we have problems with this product. You don't have the correct copyright designation. And even some of the communications afterwards said we still need the approval as to this product. We never received anything from them. They never produced anything before this summary judgment argument that, no, no, you approved it by signing off on this agreement. That was never stated in any communication from them to us. Again, the only communications that were before the Court were the e-mails from us saying you need approval. And that even happened after the agreement was signed. In response, there's nothing from them saying, no, no, no, we negotiated that already. It's already been approved. In fact, when we sent our demand letter to them, if you look at their response, they don't make this argument. They don't say, oh, this was all dealt with when we signed the second agreement. No evasion. That's just not there. So to take from the silence in the second agreement and from the Schedule C, which is clearly distinguishable and the district court distinguished it, from Schedule C that there's no mention of it, I think, again, reads into too much to this agreement and essentially creates intent that's not supported by any other piece of evidence. There was a suggestion that they were already in breach when they signed the agreement. Well, yeah, they were already in breach because, in fact, during the month before they signed it, they were violating the terms of the agreement, both the first agreement and the second agreement. But they could have cured. When we sent them the notice that you've breached the agreement, we said we just want you to identify who you sold it to. We want you to account for what you received for it. And we want you to certify that you're telling us the truth. And they refused to do that. Because, in fact, I mean, we didn't even know about this. Months and months earlier, back in 2002, they were selling this product, the Arabic product, to a country in Syria or to a company in Syria without our knowledge, without even presenting that product to us in the first place. The evidence shows that afterwards that company rejected it, in fact, because the localization was bad. What they presented to the people in Syria was a program that read from left to right. Essentially, you progress left to right. And people in the Middle East read right to left. And that was one of the bases we understood that it was rejected. So there was a very good reason for us to ask for them to give it to us first, to give it to us. But we didn't do that. They didn't do that. There's no dispute that they didn't do that. Again, there's no dispute that we ever approved this product. I thought the only thing that was lacking in the approval was the packaging. On the one that was presented to us. Again, if you look at the ---- I see. The only presented is the Spanish packaging, essentially. All right. But I understand the argument that the absence in Schedule C might support their argument. But there's no other piece of evidence that would support their argument other than that absence. And it just doesn't, to my mind, it just doesn't make sense. I didn't address the issue of whether innovation was even before the court because they felt depleted. One of the suggestions made in the reply brief was that it was in a pretrial conference order. That pretrial conference order was never signed, that's my understanding, by the judge. So it was never really presented to the court, we want to add this defense. And I don't believe that the judge even addressed it in his response to their motion for reconsideration because of that. We argue pretty ---- Well, didn't he deal with the fact that essentially the superseding ---- Again, I think with the ---- In Sun Deli, what happens is we have a long-term relationship. And there's an agreement in the middle. But all these terms are essentially the same, especially the key term, you need approval. We are letting you sell our product. We are letting you essentially change our product and then resell it. We demand that you let us approve it first. And, again, there's no evidence that they approved it. There's an argument there, but there's just no evidence. And I don't believe that the argument is strong enough for you to overturn what happened below. And I'll submit. Thank you. Thank you, counsel. Two quick points, if I may. I think the standard by which the Court interprets a written contract is under a reasonable person standard. And I think a reasonable person reading the contract and wanting to know what still remained needed to be done as to the development of the product in question would look at the specific clause that pertained to that issue and then look at the specifically negotiated schedule to find out when you had to have things done. And it would have been an extremely simple matter if they still needed further approval of the first four titles packaging to simply put it on Schedule C. Schedule C. But there was no approval at all of the first four titles. Not further. But they were submitted for approval. Right. They never really said yes or no. It was just left hanging for a very substantial period of time. Meanwhile, my client is basically going through economic ruin waiting to try and get these things to the market. According to the letter that was written by counsel for school zone, they believed they had cut a bad deal. Now, putting economic pressure on someone to renegotiate is a pretty good business tactic. And they did substantially better in Version 2 in terms of their royalties. And in one, there was no time limit on when they had to approve. And there was no provision that approval will not be unreasonably withheld. True. Restricting clauses were in the 2001 agreement. Right. But I think that's my point, that when they wrote Schedule C, they got very specific. Here's when you will do certain things. In other words, they got specifics as to when things were going to happen. And if they still required a specific as to the first four titles that were already done, and the only problem was a little problem with a copyright notice on the packaging, put it in the contract and have the parties negotiate it. Don't sandbag and wait until the thing is signed and then say, oh, by the way, you breached a long time ago before you even signed this, and here's a notice. There was a press release as to the first sale that took place in September of 2002. I rather doubt the school zone didn't know about the sale of the product. Well, that's what they claim. Pardon me? That's what they claim. That's what they claim. But there was. We're not going to resolve the evidentiary dispute on that today. I agree. The only other issue I wanted to address is there is a number of ways that you can discharge a contractual obligation under the law. One is an ovation. And contrary to what counsel said, if I have a contract with Mr. X to pay him $100,000 by a certain date and I breach it, but we then enter into a new separate contract that says it supersedes the first, and now I have to pay him $100,000 by a new date, and assuming that there's consideration for that new agreement, then my breach under the first agreement disappears. He can't sue me on the first agreement anymore, and my breach of that first agreement goes away upon execution of the second. That's what the concept of ovation is all about. And I think Your Honor's correctly pointed out that a critical language, it doesn't say just supersedes. It says it cancels the first. And everything that was done, and that was the Court's first problem, is it had to go back and get the 2001 agreement and start analyzing it in its first ruling to try and get a breach out of the second. So with that, I will submit. Thank you, counsel. Thank you. The case will be submitted for decision.
judges: Canby, Thomas, Conlon